**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| HEREFORD BIOFUELS, L.P., *et al.*,[1] | : | Case No. 09-_____ (___) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**DECLARATION OF DAROL S. LINDLOFF**
**IN SUPPORT OF FIRST DAY PLEADINGS**

1.      I am the President and Chief Executive Officer of Hereford Biofuels

Holdings, LLC, PHE I, LLC and PHE II, LLC.  I have held these positions since

September 2007.  From 2005 until September 2007,  I served as Chief Operating Officer of

Hereford Biofuels Holdings, LLC, PHE I, LLC and PHE II, LLC.  I am a graduate of

Southwestern University with a Bachelor of Science degree in Organic Chemistry.

2.      On the date hereof (the "Petition Date"), each of the above-captioned

debtors (collectively, the "Debtors") commenced a reorganization case by filing a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"),

as well as certain motions and other pleadings (the "First Day Pleadings").  I am authorized by

the Debtors to submit this Declaration on their behalf in support of the First Day Pleadings.

3.      I have reviewed each of the First Day Pleadings, and it is my belief that

the relief sought therein is necessary to:  (a) avoid immediate and irreparable harm to the

Debtors' assets; and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

---

[1]      The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Hereford Biofuels, L.P. (7548); Hereford Biofuels Holdings, LLC (9762); PHE I, LLC (7511); and PHE II, LLC (9412).  The address of each of the Debtors is 4100 Spring Valley, Suite 1002, Dallas, Texas 75244.

4.      In my capacity as President and Chief Executive Officer, I am familiar with the Debtors' day-to-day operations, assets, financial condition, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

5.      Part I of this Declaration provides an overview of the Debtors' business.  Part II provides a description of the Debtors' corporate and capital structures.  Part III provides a discussion of the events that precipitated the commencement of these chapter 11 cases, as well as the Debtors' plan for these cases.  Part IV affirms and incorporates the facts that support the relief requested in the First Day Pleadings.

## Part I

## Overview of the Debtors' Business

6.      The Debtors, through Hereford Biofuels, L.P, own an ethanol plant currently under construction in Hereford, Texas that is sized and designed to produce 115 million denatured gallons of ethanol per year (the "Hereford Facility").  The Hereford Facility, which at present is approximately 99 percent complete, will be equipped with a biomass gasification system designed to gasify approximately one billion pounds of cattle manure per year to generate the process steam required to manufacture ethanol.  When finished, the Hereford Facility will be the largest-manure-fueled ethanol plant in the United States and one of the most energy-efficient ethanol refineries.  The Hereford Facility will also be equipped with back-up natural gas boilers

designed to ensure operations on a continual basis, including, for example, when the gasifier is down for scheduled maintenance.

7.      While most other ethanol plants are located in the Midwest, the Hereford Facility is strategically situated in the Texas Panhandle, which is closer to several large ethanol and distillers' grains destination markets and one of the world's largest commercial cattle feeding regions.  The Hereford Facility's close proximity to significant ethanol markets — such as Texas, Colorado and California — will provide lower transportation costs to the blenders operating in those markets.  Similarly, the close proximity of nearby cattle feedlots will provide many revenue and cost advantages.  As examples, proximity to large cattle populations will allow access to (a) large, local markets for distillers' grains on a wet basis, which typically command a higher market price than dry distillers' grains, and (b) an ample supply of low-cost manure necessary to fuel the Hereford Facility.

8.      Once complete, the Hereford Facility will also have significant economic advantages as compared to natural gas-fueled facilities.  A manure fueled ethanol production facility like the Hereford Facility will minimize exposure to natural gas prices, the second largest variable cost of a typical ethanol plant, thereby providing increased price certainty for the cost of fuel.  Furthermore, the Hereford Facility should have a significant cost advantage over natural gas-fueled plants depending on the prevailing price of natural gas.

9.      The Debtors have no employees, but pursuant to the terms of service agreements, certain of the Debtors' non-debtor affiliates provide services to the Debtors relating to the management and operation of the Hereford Facility.  Under the terms of the service agreements, the Debtors pay fees to these affiliates for the services provided to the Debtors.

**Part II**

**Corporate and Capital Structure of the Debtors**

*Corporate Structure*

10.     Non-debtor Panda Ethanol, Inc. ("Ethanol"), a company whose stock is publicly traded over the counter on the OTC bulletin board under the trading symbol "PDAE," owns, directly or indirectly, each of the Debtors.  Debtor Hereford Biofuels, L.P. ("Hereford") is a limited partnership with Debtor PHE I, LLC as its general partner and PHE II, LLC as its limited partner.  Debtor Hereford Biofuels Holdings, LLC ("Holdings") owns a 100% membership interest in each of PHE I, LLC and PHE II, LLC.

*Capital Structure*

11.     On July 28, 2006, the Debtors closed three primary financing transactions, the proceeds of which were to be used for construction of the Hereford Facility and to provide certain working capital for the project.  These financing transactions are described in more detail below.

*Senior Credit Facility*

12.     Pursuant to a Financing Agreement dated as of July 28, 2006 (as amended, the "Senior Financing Agreement"), by and among Hereford, as borrower, Société Générale as agent (the "Prepetition Agent") and a syndicate of lenders party thereto (collectively with the Prepetition Agent, the "Senior Lenders"), Hereford obtained a senior secured credit facility (the "Senior Credit Facility").  Hereford's obligations under the Senior Credit Facility are secured by a first priority lien on substantially all of the assets of Hereford (the "Pre-Petition Collateral"). The Senior Credit Facility is comprised of a $101.6 million term loan facility, a $5.0 million working capital facility and a $51.1 million letter of credit facility.  The term loan facility has a seven-year maturity and generally bears interest at a variable annual rate equal to LIBOR plus a

margin of 3.75% pre-completion and 3.50% post-completion.  The working capital facility has a

five-year maturity and generally bears interest at the same rate as the term loan.  The letter of

credit facility has a seven-year maturity and an annual fee of 3.75% pre-completion and 3.50%

post-completion.  Interest under the Senior Credit Facility is payable quarterly.  Under the terms

of a waiver dated September 5, 2008, the applicable margin under the Senior Financing

Agreement, which is an amount added to the base interest rate and the default interest rate, was

increased by 50 basis points to 4.25%.  Under the terms of a waiver dated October 6, 2008, the

applicable margin under the Senior Financing Agreement was further increased by 150 basis

points to 5.75%.  The letter of credit facility supports $50.0 million of Tax-Exempt Bonds (as

defined and discussed below).  As of January 23, 2009, $72.2 million was outstanding under the

Senior Credit Facility.[2]

*Subordinated Credit Facility*

13.    Pursuant to a Subordinated Debt Financing Agreement, dated

July 28, 2006 (the "Subordinated Financing Agreement"), by and between Hereford, as

borrower, and Balkan Ventures LLC (the "Subordinated Lender" and together with the Senior

Lenders, the "Prepetition Lenders"), as lender, Hereford obtained a $30 million subordinated

secured credit facility (the "Subordinated Credit Facility").  Hereford's obligations under the

Subordinated Credit Facility are secured by a second lien on a portion of the Pre-Petition

Collateral and, after commencement of commercial operations, a first lien on any funds available

under a subordinated debt service reserve.  On October 6, 2008, Hereford entered into an

Amendment and Additional Funding Agreement to Subordinated Debt Financing Agreement

---

[2]      This amount includes an estimated $4.3 million for a termination fee in respect of an interest rate swap
agreement.

with the Subordinated Lender pursuant to which the Subordinated Lender agreed to, among other things, make an additional term loan to Hereford in the principal amount of $2.5 million.  The Subordinated Credit Facility has a term of up to seven years and bears interest at 12% per year, which is payable in kind until completion of the Hereford Facility.  As of January 23, 2009, $39.0 million was outstanding under the Subordinated Credit Facility.

*Tax-Exempt Bonds*

14.     Hereford issued and sold $50.0 million of tax-exempt bonds (the "<u>Tax-Exempt Bonds</u>") through the Red River Authority, a governmental agency of the State of Texas.  The Tax-Exempt Bonds bear interest at a variable rate that is reset on a weekly basis by a remarketing agent (the initial rate was 3.7%).  The Tax-Exempt Bonds are supported by the letter of credit provided under the Senior Credit Facility.

**Part III**

**Events Leading to the Commencement of
<u>These Cases and Proposed Sale of the Debtors' Assets</u>**

15.     As I previously indicated, the Hereford Facility remains under construction.  Accordingly, the Debtors have no operating revenues and all their activities to date have consisted solely of developing and constructing the Hereford Facility.  Construction of the Hereford Facility commenced in August 2006 under a fixed-price, turnkey engineering, procurement, and construction contract ("<u>EPC Contract</u>") with Lurgi, Inc. ("<u>Lurgi</u>").  Although the EPC Contract provided for a substantial completion date of December 2007, completion of construction has been significantly delayed, primarily as a result of defective foundation work and Lurgi's decision to suspend work in June 2008 to investigate a health and safety concern.  On September 18, 2008, due to a number of defaults by Lurgi under the EPC Contract, and with the approval of the Senior Lenders, the Debtors terminated the EPC Contract for cause.  Following

the termination of Lurgi, the Debtors have been managing completion of construction at the Hereford Facility themselves.

16.    The EPC Contract with Lurgi included guaranteed dates for the achievement of construction milestones related to completion of the Hereford Facility, and required Lurgi, if the milestones were not achieved by the guaranteed dates, to pay liquidated damages based on the duration of the delay, subject to certain maximum amounts.  Each of the guaranteed completion dates occurred in the fourth quarter of 2007.  On August 25, 2008, Hereford received a Demand for Arbitration from Lurgi (the "Demand").  Among other things, the Demand seeks damages, a time extension to complete construction of the Hereford Facility, a declaration that Hereford wrongfully terminated the EPC Contract, and the recovery of $16 million that Hereford drew under an irrevocable standby letter of credit for payment of liquidated damages, payments to unpaid subcontractors and vendors and for the costs of certain remedial work.  On October 21, 2008, Hereford filed a counterclaim for damages of $13 million resulting from Lurgi's failure to achieve substantial completion as required by the EPC Contract.

17.    Hereford has commenced other litigation as a result of Lurgi's failure to comply with the EPC Contract.  On October 15, 2008, Hereford, Panda Energy Management, LP, PLC II and Panda Energy International, Inc., as plaintiffs (the "Plaintiffs"), filed a petition against GEA Group, AG ("GEA"), and Kurt Torster ("Torster") in the Deaf Smith County District Court, 222 nd Judicial District.  On October 22, 2008, the Plaintiffs filed an amended petition adding Air Liquide, S.A., American Air Liquide, Inc. and Factory Mutual Insurance Company ("Factory Mutual") as defendants.  Lurgi was previously owned by GEA, which guarantied Lurgi's performance under the EPC Contract.  Air Liquide, S.A. and American Air Liquide (together, "Air Liquide") acquired Lurgi from GEA in 2007.  Torster, the former chief

executive officer of Lurgi, represented GEA in the negotiation of the contracts concerning the

Hereford Facility.  Factory Mutual issued a builder's risk policy insuring the Hereford Facility.

The complaint alleges:  (i) fraud/negligent misrepresentation against GEA and Torster;

(ii) breach of guaranty against GEA and Air Liquide; (iii) breach of contract against Factory

Mutual; (iv) common law bad faith against Factory Mutual; and (v) violations of the Texas

Insurance Code against Factory Mutual.

18.     Under the Senior Financing Agreement, the obligation of the Senior

Lenders to make loans and the ability of the Debtors to make any withdrawals from their

construction accounts are conditioned upon, among other things, the progress of construction of

the Hereford Facility.  Prior to the Petition Date, the Debtors obtained certain amendments of,

and waivers with respect to, the Senior Credit Facility that permitted further borrowings and

disbursements of loan proceeds, notwithstanding the delay in the construction schedule.  In

particular, on October 6, 2008, the Debtors obtained a waiver to permit further borrowings and

disbursements of loan proceeds of up to $31.5 million under the Senior Debt financing to allow

for completion of construction and start-up of the Hereford Facility.  This waiver was proceeded

by waivers obtained on September 5, 2008, September 30, 2008 and October 2, 2008.

19.     The borrowings and payments contemplated under the October 6 waiver

were sufficient to finalize construction of the Hereford Facility and commence ethanol

production.  Certain of the Senior Lenders, GreenStone Farm Credit Services, ACA and

GreenStone Farm Credit Services, FLCA (collectively, "GreenStone") and later Banco Bilbao

Vizcaya Argentaria S.A. ("BBVA"), however, subsequently refused to fund their share of loans

to the Debtors in breach of the October 6 waiver and the Senior Financing Agreement.  These

contract breaches by GreenStone and BBVA left the Debtors with insufficient funds to complete

construction of the Hereford Facility and, as a consequence, the Debtors could no longer make

the certifications necessary to obtain funding under the Senior Financing Agreement.  On

December 19, 2008, Hereford filed an action against GreenStone in the District Court of Dallas

County, Texas alleging breaches of the Senior Financing Agreement and seeking a declaratory

judgment that GreenStone has an obligation to perform under the financing agreement.

Although Hereford plans to file a similar lawsuit against BBVA, no action has yet been filed.

20.      Because of the failure by Greenstone and BBVA to fund their

commitments under the Senior Financing Agreement, the Debtors were unable to make the

interest payment due on December 31, 2008 under the Senior Credit Facility.  The Debtors and

the Senior Lenders thereafter entered into certain waivers of that and other defaults and the most

recent waiver expires on January 23, 2009.

21.      Prior to the Petition Date, the Debtors and their professional advisors

diligently explored various out-of-court alternatives, including a refinancing of the prepetition

secured debt, issuance of new debt and an equity infusion.  In August 2008, the Debtors retained

Imperial Capital LLC, a national financial services firm with substantial experience in the

Debtors' business sector, to assist with these efforts.  Although Imperial Capital contacted a

number of potentially interested parties, none expressed interest in pursuing a possible

transaction.  More recently, Imperial Capital began marketing the Debtors' assets for sale.

Within the last few days, the Debtors and Imperial Capital have initiated discussions with a

potential stalking horse bidder and anticipate submitting an asset purchase agreement together

with proposed bidding procedures in the next several days.

22.      Without the necessary liquidity to complete construction and start-up  the

Hereford Facility, the Debtors determined that it was appropriate and in the best interest of their

creditors and stakeholders to seek the protection of chapter 11.  The Debtors believe that a sale of

the Hereford Facility to the stalking horse bidder, or such other party that is the prevailing bidder

at an auction, will provide the best opportunity for maximizing value for the Debtors'

stakeholders.

## Part IV

### Affirmation of Facts In Support of the First Day Pleadings

23.    Concurrently with the filing of these chapter 11 cases, the Debtors filed

the First Day Pleadings requesting various forms of relief.  Generally, the First Day Pleadings

have been designed to meet the goals of (a) permitting use of cash collateral and (b) establishing

procedures for the smooth and efficient administration of these chapter 11 cases.

24.    I have reviewed each of the First Day Pleadings filed contemporaneously

herewith (including the exhibits thereto), and incorporate by reference the factual statements set

forth in the First Day Pleadings.  It is my belief that the relief sought in each of the First Day

Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the

Debtors' ability to achieve a their chapter 11 strategy.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 23, 2009
Dallas, Texas

Darol S. Lindloff